Timothy W. SWIECKOWSKI, a minor, by S. Michael SWIECKOWSKI and Catherine A. Swieckowski, his parents and next friends; S. Michael Swieckowski, individually; and Catherine A. Swieckowski, individually, Petitioners,

v.

CITY OF FORT COLLINS, a Colorado municipal corporation, Respondent.

No. 96SC89.

Supreme Court of Colorado, En Banc.

April 14, 1997.

Kiel & Trueax, P.C., Joseph Kiel, Englewood, Pribila & Sokolow, P.C., Anthony L. Sokolow, Colorado Springs, for Petitioners.

Sommermeyer Wick Dow & Campbell, L.L.C., Kent N. Campbell, Steven G. Greenlee, Fort Collins, for Respondent.

David W. Broadwell, Denver, for Amicus Curiae Colorado Municipal League.

Justice BENDER delivered the Opinion of the Court:

This case arises out of a bicycle accident which occurred on a newly widened section of a road in the City of Fort Collins (City). The parents of fifteen-year-old Timothy Swieckowski (Swieckowski) brought this action for personal injuries he suffered. Swieckowski rode his bicycle against the flow of traffic on a newly widened section of road and tumbled head first into a ditch running perpendicular to the road. The ditch was located on private property and ran along the boundary line marking the beginning of the improved section of the road. Swieckowski, the plaintiff in the district court and the petitioner in this court, seeks certiorari review of the court of appeals' decision in *Swieckowski v. City of Fort Collins*, 923 P.2d 208 (Colo.App.1995), overturning the district court's order denying the City's motion to dismiss asserting immunity from suit by operation of Colorado's Governmental Immunity Act (GIA).[1] The GIA provides that a person injured because of the dangerous condition of a public roadway may not recover against the governmental agency that owns the roadway when the cause of the dangerous condition is not due to negligent maintenance or construction by the governmental agency. It also prohibits recovery when the danger to the public posed by the condition is due solely to inadequate design.[2] The court of appeals, in holding the City immune, interpreted the GIA to mean that the abrupt end to the pavement did not constitute a "dangerous condition" due to the City's "maintenance" of the roadway and that the danger posed by the roadway existed "solely because" of its design.

We granted certiorari to determine whether the court of appeals erred in interpreting the GIA requirement that for liability to attach, the municipality must have been negligent in maintaining the dangerous condition and whether the City was protected from suit under the GIA because the danger presented by the abrupt end to the pavement was caused solely by the inadequate design of the roadway improvements.[3] We agree with the court of appeals on both issues and hold that the word "maintain," as it appears in section 24–10–103(1), 10A C.R.S. (1988), means to repair or restore a roadway to the same condition as originally constructed, and that the danger to the public posed by the roadway was attributable solely to the inadequate design of the newly widened section of road. We affirm the court of appeals and hold that the City is immune from suit under the GIA.

I.

The facts of this case are not in dispute. The City and a developer who owned land adjacent to Timberline Road in Fort Collins entered into an agreement to widen the road. Pursuant to the terms of the agreement, the developer conveyed a right-of-way to the City for the property. The developer then designed and constructed road improvements in conformance with specifications provided by the City. The improvements were to begin at a point where the road intersected with a drainage ditch owned by other private entities. The ditch ran perpendicular to the road and was approximately five feet deep and ten feet wide.

(Emphasis added.)

1. § 24–10–101 to –120, 10A C.R.S. (1988).

2. Section 24–10–103(1), 10A C.R.S. (1988), provides in pertinent part:
   "Dangerous condition" means a physical condition of a facility or the use thereof which constitutes an unreasonable risk to the health or safety of the public, which is known to exist or which in the exercise of reasonable care should have been known to exist and which condition is proximately caused by the negligent *act or omission of the public entity in constructing or maintaining such a facility.... A dangerous condition shall not exist solely because the design of any facility is inadequate.*

3. The issues on certiorari were framed as follows:
   1. Whether the court of appeals erred in its statutory construction of the term "maintain" in determining whether sovereign immunity had been waived.
   2. Whether the court of appeals erred in concluding that the dangerous condition of the roadway was created solely by inadequate design thus precluding waiver of sovereign immunity.

The design called for the road to be widened at a ninety degree angle at its intersection with the ditch. During the construction of this road improvement, the developer beveled off the asphalt into the drainage ditch at the point where the improvement started.[4] The result was that the newly widened portion of the road began with a steep ditch approximately ten feet wide with a paved downward slope of approximately five feet. The City approved and accepted the completed project on November 3, 1989, and made no further changes to the improvements as constructed by the developer.

On October 19, 1990, in the evening hours, Timothy Swieckowski, then age fifteen, was riding his bicycle on the newly widened portion of Timberline Road, traveling against the flow of traffic without the benefit of a bicycle light. He used the curb of the road improvement to guide his path in the dark. Because he did not have a light on his bicycle and because he was proceeding against the flow of traffic, Swieckowski was in violation of two Colorado statutes.[5] Viewed from the perspective of riding on the wrong side of the newly widened section of road and going the wrong way, as was Swieckowski, the widened portion of the road abruptly ended and dropped into the steep ditch. No guards, barriers, signs, signals, or markings indicated the presence of the ditch to warn a bicycle rider such as Swieckowski that he might drop off from the widened section of the road into the ditch. Swieckowski, hugging the curb in the dark, continued in a straight path on the widened improvement and fell head

first into the ditch, sustaining injuries rendering him a quadriplegic.

Swieckowski sued the City of Fort Collins on various theories, which included the claim that the City negligently constructed and maintained the newly widened section of roadway.[6] The City moved to dismiss the suit, arguing that the district court lacked subject matter jurisdiction because the case was barred by the GIA. The district court denied the City's motion to dismiss, reasoning that the "dangerous condition" was caused by the City's "maintenance."

The City appealed the district court's denial of the motion to dismiss. The court of appeals, acting under its authority in section 24–10–108, 10A C.R.S. (1996 Supp.), to hear interlocutory appeals on sovereign immunity matters,[7] agreed with the City and overturned the district court's ruling. The court of appeals held that governmental immunity barred recovery by Swieckowski against the City because the danger posed by the ditch existed solely due to the design of the roadway and because the dangerous condition was not due to construction or maintenance performed by the City. The court of appeals remanded to the district court with instructions to dismiss the suit. Swieckowski then petitioned this court for certiorari review of the decision of the court of appeals. We agree with the reasoning of the court of appeals and affirm.

## II.

Sovereign immunity issues concern subject matter jurisdiction and are deter-

---

**4.** Our review of the record reveals that a city engineer suggested paving the ditch; the engineer was present at the construction site to oversee the beveling of the asphalt into the ditch. The engineer explained during his deposition that leaving the slope exposed would result in erosion, compromising the strength of the pavement.

**5.** Section 42–4–218.5(2), 17 C.R.S. (1984 & 1989 Supp.), provides, "Every bicycle in use ... [from sunset to sunrise] shall be equipped with a lamp on the front emitting a white light visible from a distance of at least five hundred feet to the front." Section 42–4–106.5(5), 17 C.R.S. (1984 & 1989 Supp.), provides in pertinent part, "Any person riding a bicycle shall ride in the right-hand lane."

**6.** Swieckowski also sued developer K. Bill Tiley, who constructed the improvements. The trial court granted Tiley's motion for summary judgment dismissing him from the case. The court of appeals overturned the granting of this motion, permitting Swieckowski to proceed with his claim against Tiley. Tiley petitioned this court for certiorari review of the court of appeals' decision. We did not grant certiorari on this issue.

**7.** Section 24–10–108, 10A C.R.S. (1996 Supp.), provides in pertinent part:

If a public entity raises the issue of sovereign immunity .... [t]he court's decision on such motion shall be a final judgment and shall be subject to interlocutory appeal.

**1384**

mined in accordance with C.R.C.P. 12(b)(1).[8] *See Fogg v. Macaluso,* 892 P.2d 271, 275 (Colo.1995). Any factual dispute upon which the existence of jurisdiction may turn is for the district court to resolve, and an appellate court will not disturb the factual findings of the district court unless they are clearly erroneous. *See Trinity Broad. v. City of Westminster,* 848 P.2d 916, 924–25 (Colo.1993). However, if, as here, the underlying facts are undisputed, the issue is one of law, and an appellate court is not bound by the district court's determinations. *See id.* at 925.

The GIA bars actions in tort against public entities, subject to the exceptions enumerated by the General Assembly in section 24–10–106(1), 10A C.R.S. (1988), which provides in pertinent part:

> (1) A public entity shall be immune from liability in all claims for injury which lie in tort.... Sovereign immunity is waived by a public entity in an action for injuries resulting from:
>
> ....
>
> (d) A dangerous condition of a public highway, road, or street which physically interferes with the movement of traffic on the paved portion, if paved, or on the portion customarily used for travel by motor vehicles, if unpaved, of any public highway, road, street, or sidewalk within the corporate limits of any municipality....

A "dangerous condition," in turn, is defined in section 24–10–103(1), 10A C.R.S. (1988), as follows:

> "Dangerous condition" means a physical condition of a facility or the use thereof which constitutes an unreasonable risk to the health or safety of the public, which is known to exist or which in the exercise of reasonable care should have been known to exist and which condition is proximately caused by the negligent *act or omission of the public entity in constructing or maintaining such a facility....    A dangerous*

*condition shall not exist solely because the design of any facility is inadequate.*
(Emphasis added.)

█ To recover under this provision of the GIA, a plaintiff must show as a threshold jurisdictional matter that the condition upon which the plaintiff bases his tort claim existed because of the government's act or omission in maintaining or constructing the condition rather than the government's design of the condition. In determining whether the GIA presents a jurisdictional bar to this suit, we emphasize that we do not address issues of negligence or causation, which are matters properly resolved by the trier of fact.

The parties agreed that the City did not construct the newly widened section of Timberline Road where it intersected the ditch. Therefore, the issue is whether the danger posed by the ditch was due to "maintenance" of the widened roadway, giving rise to potential liability of the City, or whether the danger posed by the ditch was due solely to the "design" of the widened roadway, barring suit against the City. The GIA statute defines neither the word "maintain" nor the word "design." Thus, we discuss the meaning of both words in the context of the GIA.

### A.

Swieckowski argues that the word "maintain," as it appears in the GIA, includes the concept of owning the dangerous condition and that mere ownership of the condition renders the City liable to suit. He contends that "the mere act of owning and keeping a roadway in existence, if it constitutes a dangerous condition, waives sovereign immunity regardless of whether there was a failure to make repairs and regardless of whether the condition of the roadway had been altered from the time of its initial construction." We disagree with Swieckowski's broad interpretation of the word "maintain."

█ In construing statutory provisions, a court must endeavor to give effect to the intent of the General Assembly. *See State v. Hartsough,* 790 P.2d 836, 838 (Colo.1990).

8. C.R.C.P. 12(b) provides in pertinent part:

[T]he following defenses may at the option of the pleader be made by motion: (1) Lack of jurisdiction over the subject matter....

To that end, we give the statutory terms their plain and ordinary meaning. *See id.* We should interpret the statute in a way that best effectuates the purpose of the legislative scheme. *See Smith v. Myron Stratton Home,* 676 P.2d 1196 (Colo.1984).

■ Swieckowski's proposed interpretation of the word "maintain" is not supported by the common meaning of the word "maintain." As the court of appeals noted, "maintain" is defined as keeping a constructed edifice, structure, or improvement in the same general state of being, repair, or efficiency *as initially constructed. Webster's Third New International Dictionary* 1362 (1986). Under this definition, a failure to "maintain" a roadway is not a failure to keep a roadway in existence, but a failure to restore a roadway to the state in which it was originally constructed.

■ Additionally, Swieckowski's interpretation of the word "maintain" is inconsistent with the legislative history of this statute. In 1992, the General Assembly amended the definition of "dangerous condition" to include the following language: "Maintenance does not include any duty to upgrade, modernize, modify, or improve the design or construction of a facility." *An Act Concerning Public Liability Pursuant to the "Colorado Governmental Immunity Act,"* ch. 172, 1992 Colo. Sess. Laws 1115. Under the 1992 amendment, while the government has no duty to improve a roadway, it does have a duty to repair a roadway where the roadway has changed from its original condition and this change poses a danger. As one of the bill's primary sponsors explained:

> Also in section one, we add a definition of the word "maintenance" to clarify that the duty to maintain means only a duty to keep a street or facility in its original or improved condition. It does not include any duty to upgrade, modernize or improve a street or facility such as additional construction standards or change of the way of use might apply.

*Second Reading of H.B. 1291 Before the House of Representatives,* 58th Gen. Assembly, 2d Reg. Sess. (1992) (statement of Rep. Faye Fleming). This court may find a legislative amendment to be a clarification where the legislative history or the language of a statute clearly indicates an intent to clarify. *See Rickstrew v. People,* 822 P.2d 505, 508 (Colo.1991) (construing statutory language in light of clarification provided by subsequent amendment). Here, the bill's sponsor stated that the purpose of the amendment was to clarify the definition of the word "maintain." This amendment clarifies that the government's duty to "maintain" was intended by the legislature to mean a duty to restore a facility to the same condition as originally constructed. To hold the government responsible for simply "keeping a public roadway in existence" implies a duty to improve the roadway which is contrary to the express intent of the General Assembly. In addition, the interpretation suggested by Swieckowski would virtually eliminate governmental immunity by permitting suit in most cases where the government owns the property at issue.

Swieckowski cites several cases in support of the proposition that ownership constitutes "maintenance." While these decisions applied the term "maintain" to impose potential liability on the government for dangerous road conditions under the GIA, none of these cases held that mere ownership could give rise to potential government liability. Instead, these cases establish the proposition that the government may be liable where it failed to repair, or failed to restore a facility to its original state. *See State v. Moldovan,* 842 P.2d 220, 224–25 (Colo.1992) (government liable for failure to repair damaged fence which allowed cow to enter roadway); *Wheeler v. County of Eagle,* 666 P.2d 559, 561 (Colo.1983) (government liable for failure to clear trees and bushes which had grown to extend to the road); *Stephen v. City & County of Denver,* 659 P.2d 666, 668 (Colo.1983) (government liable for failure to repair stop sign which had been turned to face the wrong direction); *Hallam v. City of Colorado Springs,* 914 P.2d 479, 482–83 (Colo.App. 1995) (government liable for failure to replace barriers when someone had moved them); *Schlitters v. State,* 787 P.2d 656, 657–58 (Colo.App.1989) (government liable for failure to secure loose boulders above road).

Swieckowski's interpretation of "maintain," under which mere ownership can give rise to liability, is unsupported. The common meaning of the word "maintain," its legislative history, and Colorado case law support the court of appeals' finding that a failure to "maintain" means a failure to keep a facility in the same general state of being, repair, or efficiency as initially constructed.

■ Applied to this case, the City is immune from liability for the roadway's abrupt transition at the ditch; should the roadway undergo changes, potential liability would attach for failure to restore the roadway to the condition in which it was originally constructed. It is undisputed that on the day Swieckowski was injured on the roadway, the roadway was in the same condition as when it was originally constructed. Because the roadway remained unchanged, the City did not repair the roadway, and is immune from any claims of negligence for allowing this condition to exist. We hold, therefore, that the court of appeals did not err in its determination that the City did not "maintain" the roadway for purposes of the GIA.

### B.

Swieckowski also argues that the roadway constituted a "dangerous condition" because the existence of the condition was not solely due to inadequate design of the roadway and therefore, under the GIA, governmental immunity is waived. Again, we disagree.

■ The GIA expressly excludes from the definition of "dangerous condition" any danger solely attributable to inadequate design. *See* § 24–10–103, 10A C.R.S. (1988). The common meaning of the word "design" is to conceive or plan out in the mind. *See Webster's Third New International Dictionary* 611 (1986). The admitted fact that the conception, or the plan, for the roadway improvements called for the widened portion to begin at the boundary line running along the ditch establishes that the danger posed by the roadway's abrupt transition at the ditch was attributable solely to design.

This court addressed this "design exception" to liability in *Willer v. City of Thornton,* 817 P.2d 514 (Colo.1991). In *Willer,* the plaintiff was injured after his car struck a dip in the pavement at an intersection. The court held that the government was immune under the GIA because "the complaint does not allege that the City's acts in constructing or maintaining the intersection differed in any way from the provisions for construction and maintenance of the intersection contained in the initial design." *Id.* at 517. Also persuasive is *Szymanski v. Department of Highways,* 776 P.2d 1124 (Colo.App.1989), where the plaintiff contended that his injuries were the result of an intersection's "blind spot," improper sightlines, unduly high speed limit, and lack of warning signs regarding the dangerousness of the intersection. The court of appeals found that these problems were all design flaws, despite the plaintiff's attempts to label them otherwise, and determined that the government was immune. *See id.* at 1125.

The parties agree that the road was constructed according to design. As the court of appeals aptly noted, the design did not call for a bridge, the filling of the ditch, the construction of a taper to bypass the ditch, or the use of barricades or fences to warn pedestrians and bicycles of the existence of the ditch. The design called for the improvement to begin abruptly at the boundary line running along the side of the ditch, which it did.

Swieckowski argues creatively that the roadway's danger did not exist solely because of its design. He asserts that the act of joining the designed improvements with the pre-existing physical feature, namely, the drainage ditch, in part contributed to the roadway's danger. The flaw in this position is that it assumes that the design of the improved roadway exists in the abstract, independent from the existing physical features which are contiguous to the improvement. On the contrary, existing physical features are part of a design of an improved roadway. The beveling of the downward slope of the ditch and the widened portion's abrupt beginning at the road's intersection with the ditch were not accidental. Both features were part of the design of the improvement. Even assuming that the City designed the improvements without consider-

ing existing physical features, the City would nevertheless be immune because the danger posed would then be attributable to the City's negligence in failing to consider these physical features in the design of the widened, improved roadway.

## C.

This case, viewed in the light most favorable to the plaintiff as is necessary at this stage of the proceedings, presents an egregious example of the inequities of the GIA. A young boy was seriously injured. From the limited facts presented it appears that the condition that caused this accident was one which was readily predictable and could have been easily avoided. Governmental immunity exists due to the General Assembly's policy decision to protect the government from suit by persons who are injured by the negligent acts of governmental entities. Section 24–10–102, 10A C.R.S. (1988), recognizes that unlimited liability of public employees "could disrupt or make prohibitively expensive ... essential public services and functions"; that limitations are necessary to "protect the taxpayer against excessive fiscal burdens"; and that "public employees should be protected" so that they will not be "discouraged from providing the services or functions required by the citizens or from exercising the powers authorized or required by law." Here, Swieckowski contends that the City permitted a hazard to exist which was, in effect, an accident waiting to happen. Further, the record as established at this early stage indicates that the danger posed

by the ditch could have been remedied cheaply and easily by the placement of a barricade or a warning device at the beginning of the improvement. The legislature, however, expressly precludes liability for a public entity's failure to post signs on a public highway.[9]

The potential for severe and disabling injury to persons, like Swieckowski, who might be riding their bicycles or walking the wrong way at night, should have been known to the City's professionals, such as the city engineer, who approved the developer's design and construction of the newly widened section of the road. Their involvement occurred almost twelve months before the accident, which gave the City adequate time to install some type of warning device. Protecting the City from suit discourages rather than encourages governmental agencies from remedying potential hazards to their citizens and runs counter to the sound policy of holding governmental entities responsible for their actions. *See Evans v. Board of County Comm'rs*, 174 Colo. 97, 101, 482 P.2d 968, 970 (Colo.1971) (abolishing judicially created sovereign immunity because the doctrine was "causing too great a degree of injustice").

■ However, we are constrained by limiting principles of judicial review to interpret statutory language consistently with the intent of the General Assembly and with the plain meaning of the words chosen by this body when it enacts a statute. We may not substitute our view of public policy for that of the General Assembly.[10] As discussed in this

---

**9.** Section 24–10–106(1), 10A C.R.S. (1988), provides:

Sovereign immunity is waived by a public entity in an action for injuries resulting from:
. . . .
(d) A dangerous condition of a public highway, road, or street which physically interferes with the movement of traffic.... As used in this section, the phrase "physically interferes with traffic" shall not include traffic signs, signals, or markings, or the lack thereof, but shall include the failure to repair a stop sign or a yield sign which reassigned the right-of-way or the failure to repair a traffic control signal on which conflicting directions are displayed....

**10.** We note the remarks offered at the hearings on the 1992 amendments:

[W]hat we are trying to do is restore the Governmental Immunity Act to what we envision

the General Assembly when they originally passed it had in mind and move it back away from the expansive manner in which the [Supreme] Court seems to be interpreting this particular Act. And that's what is driving it completely as a result of numerous court actions and decisions that keep coming down trying to interpret what the General Assembly had in mind at one point in time.

*Hearings on H.B. 1291 Before the House Local Government Committee*, 58th Gen. Assembly, 2d Reg. Sess. (1992) (statement of Rep. Faye Fleming).

I want to reiterate that except for the provision regarding snow and ice removal, the court reform provisions of the bill, these changes [have] not changed the legislative intent that has existed for the Governmental Immunity Act since 1986 and before. We are not trying

opinion, we apply traditional rules of statutory interpretation to reach the conclusion, reluctantly, that the City is immune from suit in this case.

## III.

We agree with the court of appeals and hold that the word "maintain," as it appears in section 24–10–103(1), 10A C.R.S. (1988), means to repair or restore a roadway to the same condition as originally constructed and that the danger to the public posed by the ditch was attributable solely to the inadequate design of the improved roadway. We affirm the court of appeals and hold that the City is immune from suit under the GIA.

VOLLACK, C.J., dissents, and SCOTT, J., joins in the dissent.

### Chief Justice VOLLACK dissenting:

The majority holds that the City of Fort Collins (the City) is immune from suit under the Colorado Governmental Immunity Act (GIA), §§ 24–10–101 to –120, 10A C.R.S. (1988 & 1996 Supp.), for injuries sustained by Timothy Swieckowski (Swieckowski) when he rode his bicycle into a paved ditch that ran perpendicular to a City street. The majority reasons that the dangerous condition of the roadway did not arise out of the City's maintenance of the facility, but was solely attributable to the roadway's inadequate design. Consequently, the majority concludes that section 24–10–103(1), 10A C.R.S. (1988), bars Swieckowski's claim against the City. In my view, the City's failure to remedy a known, obvious, and extremely dangerous condition on the roadway constitutes a negligent omission in maintaining the government facility pursuant to section 24–10–103(1). For this reason, I dissent and would reverse the court of appeals.

## I.

Swieckowski suffered permanent injuries when he rode his bicycle off an abrupt edge of a newly widened roadway, causing him to

to change that, we are just trying to send a clear message to the court that when you say something you mean it.

fall head first into a drainage ditch five feet below the road's surface. The City filed a motion to dismiss Swieckowski's cause of action, alleging that the district court did not have jurisdiction to hear the case because Swieckowski's claims were barred by the GIA. The district court dismissed Swieckowski's claims as they related to improper design and the City's failure to erect warning signs, but refused to dismiss Swieckowski's tort claims based upon negligent construction and maintenance.

## II.

Because governmental immunity is in derogation of common law, legislative grants of immunity must be strictly construed. *See City and County of Denver v. Gallegos,* 916 P.2d 509, 510 (Colo.1996). In construing a statute, courts must look to the language of the statute, giving effect to each word and phrase using commonly accepted meanings. *See Regional Transp. Dist. v. Lopez,* 916 P.2d 1187, 1190 (Colo.1996). However, a reviewing court should avoid statutory constructions which lead to absurd results. *See id.* at 1192.

Section 24–10–106, 10A C.R.S. (1988), provides in relevant part:

(1) A public entity shall be immune from liability in all claims for injury which lie in tort ... except as provided otherwise in this section. Sovereign immunity is waived by a public entity in an action for injuries resulting from:

. . . .

(d) A dangerous condition of a public highway, road, or street which physically interferes with the movement of traffic on the paved portion ... of any public highway, road, street, or sidewalk within the corporate limits of any municipality ... which was designed and intended for public travel or parking thereon.

Section 24–10–103(1) defines "dangerous condition" to mean

*Hearings on H.B. 1291 Before the House Local Government Committee,* 58th Gen. Assembly, 2d Reg. Sess. (1992) (statement of Kathy Haddock of the Colorado Municipal League).

a physical condition of a facility or the use thereof which constitutes an unreasonable risk to the health or safety of the public, which is known to exist or which in the exercise of reasonable care should have been known to exist and *which condition is proximately caused by the negligent act or omission of the public entity in constructing or maintaining such facility.*

(Emphasis added.)

In analyzing the facts of this case, this court is constrained to consider dangerous conditions on roadways as either design, construction, or maintenance flaws. As the district court correctly found, the City is immune from claims which assert either an inadequate design or a failure to post warning signs. *See* § 24–10–103(1); § 24–10–106(1)(d). Similarly, this court is precluded from classifying the dangerous condition as a construction flaw because the construction was done by a private party. Therefore, this court must consider whether the dangerous condition arose out of the City's duty to maintain the roadway.

While a literal construction of the term "maintaining" found in section 24–10–103(1) only encompasses the *repair and restoration* of existing roadways, it is my view that maintenance, in a more general sense, also includes repairing dangerous conditions which become apparent after design and construction of the roadway is complete. Once discovered, the government entity has a duty to remedy dangerous conditions which pose a significant and extreme danger to those who use the roadway. *See State v. Moldovan,* 842 P.2d 220, 223–24 (Colo.1992); *Stephen v. City and County of Denver,* 659 P.2d 666, 668 (Colo.1983).

The effect of immunizing government entities in these situations is to reward the government entity for its inaction even though the health and safety of its citizenry has been jeopardized. Such a result is contrary to both the common law and the purposes of the GIA. *See Evans v. Board of County*

*Comm'rs,* 174 Colo. 97, 98, 482 P.2d 968, 968 (1971); § 24–10–102, 10A C.R.S. (1988); *see also Moldovan,* 842 P.2d at 222 (explaining that one of the basic but often overlooked purposes of the GIA is to permit a person to seek redress for personal injuries caused by a public entity).

I disagree with the majority's statutory analysis which construes the word "maintaining" to only include repairing or restoring roadways to their original condition. This statutory construction renders dangerous conditions such as the one in the present case design flaws, barring any claim brought against the government entity. Under such a reading, the government is immune even if it designs a roadway that is totally inadequate for public use.[1] Additionally, the fact that Swieckowski would have a cause of action against the City if he rode his bicycle into a small pothole, but is barred from suit for riding off a five-foot drop in the road, leads to an absurd result in this particular case.

Prior decisions of this court have construed the GIA to waive governmental immunity in situations where the relationship between the government's maintenance obligation and the cause of the accident itself was more attenuated than the present case. *See Moldovan,* 842 P.2d at 224–25 (holding the government liable for its failure to repair a hole in a fence which allowed a cow to enter the roadway where it was then struck by a man riding a motorcycle); *Wheeler v. County of Eagle,* 666 P.2d 559, 561 (Colo. 1983) (holding that summary judgment against the plaintiff was not appropriate for the county's failure to trim bushes and trees alongside a road, which forced the plaintiff to walk on the road where she was then struck by an automobile); *Stephen,* 659 P.2d at 668 (holding the city and county liable for its failure to repair a stop sign that was turned in the wrong direction by an anonymous

1. At oral argument, counsel for the City posited that the State could conceivably build a road that ended high off the ground without taking any precautions to prevent users from falling off its edge. So long as the road was properly maintained in its original condition, counsel for the City contended that governmental immunity would bar any claims brought against the State because such claims would be based upon the road's inadequate design.

third party, which led to an automobile accident).[2]

While this case is analogous to *Willer v. City of Thornton,* 817 P.2d 514, 517–19 (Colo. 1991), where we held that a plaintiff who was injured after driving across a dip in an intersection was barred from asserting a claim under the GIA, the facts of *Willer* are not nearly as extreme as the facts in the present case. Clearly, there is a distinction between a dip in the road and a five-foot precipice that makes the latter condition so dangerous that it places an immediate obligation on the government entity to make the condition safe.[3]

### III.

The majority concedes that a newly widened road that suddenly drops five feet into a drainage ditch was "an accident waiting to happen" and that the City should have

known that this dangerous condition existed. Maj. op. at 1387. As a result of the City's failure to remedy this dangerous condition, one of its citizens was permanently injured. In my view, the City's failure to remedy this known, obvious, and extremely dangerous condition on its public roadways constitutes a negligent omission in maintaining a government facility pursuant to section 24–10–103(1). I would therefore reverse the court of appeals and reinstate the district court's order. Accordingly, I dissent.

I am authorized to say that Justice SCOTT joins in this dissent.

---

2. In response to these cases, the General Assembly amended the definition of "dangerous condition" to include the following language: "Maintenance does not include any duty to upgrade, modernize, modify, or improve the design or construction of a facility." *See* § 24–10–103(1), 10A C.R.S. (1996 Supp.). This statutory change came after the accident in this case and is therefore inapplicable. However, the comments of the bill's sponsor indicate that the amendment was attempting to address two specific fact situations. First, the General Assembly sought to rein in the case law which imposed liability upon governments for not keeping roadways free of obstructions such as livestock, abandoned cars, or car parts. *See Hearing on H.B. 1291 Before the House Local Government Committee,* 58th Gen. Assembly, 2d Reg. Sess. (Hearing Tape 92–10, Feb. 17, 1992) [hereinafter *"House Hearings"*] (statement of Rep. Faye Fleming). Second, the General Assembly sought to relieve government entities from the burden of having to constantly upgrade facilities as a result of ever-

changing safety standards. *See Second Reading of H.B. 1291 Before the House of Representatives,* 58th Gen. Assembly, 2d Reg. Sess. (Hearing Tape 92–13, Feb. 27, 1992) (statement of Rep. Fleming). In addressing these concerns, the General Assembly sought to limit actionable claims to those injuries caused by the specific physical condition of the road. *See House Hearings* (statement of Rep. Fleming). Here, Swieckowski's cause of action concerns a specific physical condition of the road that made it extremely dangerous. Therefore, his cause of action is consistent with the 1992 amendment to section 24–10–103(1).

3. This difference in the severity of dangerous conditions is made more apparent by the injuries suffered by the respective plaintiffs in *Willer* and in this case. In *Willer,* the plaintiff suffered "head and neck discomfort" as a result of his car's impact with the dip in the road. In this case, Swieckowski was rendered a quadriplegic after riding his bicycle off the roadway and into the ditch.